DATE FILED: July 26, 2021 5:38 PM
FILING ID: DB5F2A5456183
CASE NUMBER: 2021CV31157

| | |
|---|---|
| **DISTRICT COURT, EL PASO COUNTY STATE OF COLORADO** Court Address: 270 S Tejon St Colorado Springs, CO 80903 **Plaintiffs:** Jamie Melde, Caraleigh Kahn **v.** **Defendant:** Albertsons Companies, Inc. **Attorneys for Plaintiff:** Diane S. King CO Bar #16925 KING & GREISEN, LLP 1670 York Street Denver, CO 80206 (303) 298-9878 (voice) (303) 298-9879 (fax) king@kinggreisen.com | **COURT USE ONLY** Case Number: Div.:        Ctrm.: |

| |
|---|
| **COMPLAINT AND JURY DEMAND** |

Plaintiffs Jamie Melde and Caraleigh Kahn, on behalf of themselves and through her

attorneys, KING & GREISEN, LLP, hereby bring this Complaint against Defendant Albertsons

Companies, Inc. ("Albertsons").

## INTRODUCTION

Defendant Albertsons's Asset Protection Department ("APD") was the epitome of an old

boys' club. The managers hired only the females with whom they wanted to have sex. Once

hired, those female employees were subjected to relentless harassment, with demands for heavy

drinking on and off the job, late-night meetings, stories of sexual conquests, and invasive

questions about their employees' sex lives.

-1-

Anthony Chittum and Nathan Bandaries – two of the managers in the department – had identical modus operandi: if a female employee resisted their sexual advances, that employee's days at Albertsons were numbered. As soon as their targets demonstrated disinterest in sexual relationships with them, Chittum and Bandaries would immediately launch retaliation campaigns against such female employees. To eliminate the non-compliant females, Chittum and Bandaries employed career roadblocks, manufactured or exaggerated accusations or discipline, and finally termination. When their victims complained to higher managers or Human Resources "HR" about their treatment, such managers would placate the complainers and promise to address their concerns, but in reality, they would join the ongoing retaliation campaign against the complainers.

Two such employees – Jamie Melde and Caraleigh Kahn – decided to hold the Defendant accountable for its and its managers' actions. Below are the details of their claims.

## JURISDICTION AND VENUE

1.     Jurisdiction is proper in this Court pursuant to the Colorado Constitution Article VI, § 9, and the amount in controversy meets the jurisdictional limit of this Court.

2.     Venue is proper pursuant to Rule 98 of the Colorado Rules of Civil Procedure, because all the events giving rise to the claims asserted herein occurred in El Paso County.

3.     This action is authorized by and instituted pursuant to

    a.     Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5(f)(1) and (3);

    b.     Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981A;

-2-

c.      Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a);

4.      All procedural prerequisites for the filing of this suit have been met. Ms. Melde and Ms. Kahn timely filed Charges of Discrimination alleging sex discrimination and retaliation for engaging in protected activity in opposition to discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC").

5.      Ms. Kahn timely filed a Charge of Discrimination alleging disability discrimination with the EEOC.

6.      Ms. Melde received a Notice of Right to Sue from the EEOC on April 27, 2021 and has filed this Complaint within 90 days of receiving such notice.

7.      Ms. Kahn received a Notice of Right to Sue from the EEOC on April 28, 2021 and has filed this Complaint within 90 days of receiving such notice.

8.      At all relevant times, Defendant has continuously been doing business in the State of Colorado and has continuously employed at least fifteen (15) employees.

9.      At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

## PARTIES

10.     Plaintiffs Jamie Melde and Caraleigh Kahn are women who currently are, and at all times relevant to this action have been, citizens of the United States of America and residents of the State of Colorado.

11.     At all times during the events giving rise to this action, Ms. Melde and Ms. Kahn

were employees employed by Albertsons as an Asset Protection Specialist ("APS") and an APS

Organized Retail Crime ("ORC") investigator, respectively.

12.     Defendant Albertsons is an Idaho corporation with principal offices located in

Boise, Idaho.

13.     At all times relevant to this action, Defendant Albertsons has been an employer

within the meaning of 42 U.S.C. § 2000e(b).

14.     Defendant Albertsons maintains Albertsons and Safeway stores throughout

Colorado, including in Colorado Springs.

## FACTUAL ALLEGATIONS REGARDING JAMIE MELDE

**I.      Ms. Melde Begins Her Employment at Safeway and Excels in Her Performance.**

15.     On November 5, 2017, Jamie Melde was hired to work as an APS at Safeway in

Colorado Springs by APS Supervisor Anthony Chittum.

16.     Among Ms. Melde's duties was investigating shoplifting incidents and making

"stops" or "recoveries" when circumstances warranted her action.

17.     Ms. Melde had a male partner assigned to her.

18.     When she concluded her training in February 2018, Chittum commended Ms.

Melde on her number of stops.

19.     Ms. Melde was told that she was on track to exceed the division average.

20.     In her first four (4) months at Safeway, Ms. Melde made more stops than any of

her male colleagues.

21.     In her first four (4) months at Safeway, Ms. Melde made 34 stops in four (4) months compared to a division average of 16 for the same time period.

22.     ORC Manager Nathan Bandaries, Chittum's superior, and Operations Manager David Barnes told Ms. Melde in February 2018 how valuable she was to the team because of her high productivity.

II.     **Chittum Sexually Harasses Ms. Melde: (1) Fosters an "Old Boys Club" at Safeway, (2) Orchestrates Opportunities To See Her Late at Night, (3) Forces Sexual Conversation on Her at Work.**

23.     When Ms. Melde was hired, Safeway employed (1) very few women in the Asset Protection ("AP") Department and (2) no other women on the Colorado Springs team.

24.     Chittum enjoyed and helped foster an "old boys club" culture in the department, where the men engaged in frequent sexual banter, excessive drinking, and competition for sex with female employees.

25.     The only time women were included in this male, bravado culture was when Chittum "wanted a piece" of them.

26.     Chittum hired Ms. Melde because he wanted to "fuck her."

27.     For the first few months of Ms. Melde's employment, Chittum tried to orchestrate situations where he would be alone with her late at night.

28.     Chittum often invited Ms. Melde to his house to "hang out" alone after a night of drinking with the team, which she always declined.

29.     By early 2018, Ms. Melde stopped going out after hours with the team because Chittum's propositions made her uncomfortable.

-5-

30.     After months of Ms. Melde's repeated rejection of Chittum's advances, he became resentful.

31.     Chittum sent Ms. Melde accusatory emails unfairly criticizing her work, refused to answer work-related questions, and blamed her for not knowing procedures that were not part of her training.

32.     Chittum badmouthed Ms. Melde to her male colleagues.

**III.     Defendant Discriminates Against Ms. Melde Based on Her Gender.**

> **A.     <u>Defendant Pays Ms. Melde Less Than Her Male Colleagues</u>**

33.     As one form of compensation, Defendant's employees received mileage reimbursement when their work-related driving mileage exceeded their commuting distance. Therefore, proximity of the "home store" to an employee's home determined the amount of mileage reimbursement an employee would receive.

34.     Ms. Melde received less compensation in mileage reimbursement than her male colleagues because she was assigned to a "home store" that was not close to her home.

35.     Ms. Melde's male colleagues were assigned to a "home store" close to their homes and received higher mileage reimbursement than Ms. Melde.

36.     Additionally, in May or June 2018, Ms. Melde discovered that all her male colleagues in the Colorado Springs and Pueblo stores had received a raise, including colleagues that started after her.

37.     Ms. Melde received no raise despite her significant experience and high productivity.

38.     As a result of the raise, some of her less experienced colleagues with the same title were making $16 per hour, whereas she was making only $15.50.

39.     When Ms. Melde complained about the pay disparity, Chittum's supervisor David Montoya told her the budget did not include the funds for her raise.

**B.      Safeway Treats Ms. Melde's Accommodation Request Differently from Those of Her Male Colleagues.**

40.     In late February 2018, Ms. Melde requested "desk duty" or a similar accommodation for six (6) weeks to recover from an upcoming surgery.

41.     Chittum denied Ms. Melde's accommodation request, although he had granted similar accommodations for Ms. Melde's male colleagues.

**C.      Despite Repeated Requests, Safeway Denies Ms. Melde the Training Opportunities Available to Male Employees.**

42.     Although handcuff certification is a pre-requisite for the APS job, Ms. Melde never received the training necessary to obtain the certification.

43.     Beginning in February 2018, Ms. Melde started complaining to Chittum about her lack of certification, stating specifically that all her male colleagues had been certified and that her certification was particularly critical given her partner's certification had lapsed.

44.     Chittum never responded to Ms. Melde's complaints and requests.

45.     In April 2018, Ms. Melde complained to Bandaries and Barnes about her lack of handcuff certification, which they acknowledged raised serious safety concerns.

46.     Nothing was done to address the issue.

47.     Ms. Melde complained once more to Montoya on July 5, 2018, about her need for additional training, explaining that some of Chittum's expectations of her were unclear perhaps because she was never properly trained.

48.     Montoya responded that he would consider her request for additional training.

**D.     Defendant Denies Ms. Melde a Promotion for Which She Was Qualified.**

49.     On or around March 7, 2018, the whole APS team was encouraged to apply for an Organized Retail Crime Investigator position.

50.     Ms. Melde applied for the position on March 12, 2018.

51.     Ms. Melde was the only female employee to apply for the position.

52.     Ms. Melde the only team member who was not even interviewed for the position, although she had more experience and a better record than some of her male colleagues.

53.     Chittum helped some of Ms. Melde's male colleagues apply for the position and revise their resumes but did not do the same for her.

54.     A male employee was selected for the position.

**IV.     Ms. Melde Complains to Management about Discrimination.**

55.     Beginning in January 2018 and until her termination, Ms. Melde complained about gender disparities in mileage reimbursement, lack of training opportunities, and discipline.

**A.     Ms. Melde Requests a Different Partner But is Denied the Request.**

56.     In February 2018, Ms. Melde alerted Chittum that her partner's constant focus on courting female employees was impeding Ms. Melde's ability to do her job.

-8-

57.     On or around April 18, 2018, Ms. Melde complained again to Chittum about her partner 's behavior, including that his girlfriends would accompany him while he walked the floor of stores, and that he frequently engaged in inappropriate sex talk on the job.

58.     When Ms. Melde requested a different partner, Chittum responded, "You can't always get your way."

**B.**     **Ms. Melde Futilely Complains About Gender Disparity in Training Opportunities.**

59.     Ms. Melde complained to Chittum that she, unlike her male colleagues, had not been handcuff certified, which was impeding her work.

60.     Chittum did not respond to Ms. Melde's concerns.

61.     When Chittum failed to act, Ms. Melde also complained on multiple occasions to Montoya, Bandeires, and Barnes about her lack of training and handcuff certification, to no avail.

**C.**     **Ms. Melde Escalates Her Discrimination Complaints to HR and Higher Management.**

62.     Frustrated that Chittum was not addressing any of her complaints of disparate treatment, Ms. Melde escalated her concerns to HR.

63.     On April 24, 2018, Ms. Melde submitted a written complaint to Judy Dolan in HR and Bandaries regarding unequal treatment by Chittum and unprofessional conduct by her partner Swenson.

64.     Approximately one week later, Ms. Melde was interviewed by Bandaries and Operations Manager David Barnes about her complaint.

65.     During the interview, Ms. Melde explained, among other things, that her partner Ben Swenson and Chittum were sleeping with the same Safeway employees and then flaunting their "sexual conquests," causing work-related tension.

66.     She additionally explained how the mileage policy and denial of handcuff certification training were unfairly impacting her.

67.     Bandaries and Barnes promised to address Ms. Melde's concerns, particularly the mileage policy and lack of handcuff certification, and agreed that the certification issue posed a serious safety issue for everyone.

68.     Bandaries and Barnes also told Ms. Melde to notify them immediately if she experienced any retaliation.

69.     Bandaries and Barnes stated repeatedly that they did not want to lose Ms. Melde on the team because she was a "productive employee" with a great performance record.

**D.     Ms. Melde Complains about Being Excluded from Training New Employees.**

70.     Ms. Melde also complained on July 5, 2018, that her male colleagues were permitted to train new hires, but she was not.

71.     For example, male employees Rudy Lopez, Randem Beckner, Sean Slattery, and Miguel Reyes all trained Hannah Davidson, but Ms. Melde was not permitted to do so despite her significant AP experience and excellent track record on stops.

72.     Ms. Melde overlapped with Ms. Davidson for approximately two weeks, during which time Ms. Davidson was trained by at least four different male APSs but not Ms. Melde.

-10-

73.     At the time, Lopez had only six (6) months of experience as an APS compared to Ms. Melde's seven (7) years of experience.

V.     **Defendant Retaliates Against Ms. Melde for Her Gender Discrimination and Retaliation Complaints.**

74.     After Ms. Melde started complaining about sex discrimination, Chittum started building a case for her termination despite her excellent performance.

A.     **Chittum Disciplines Ms. Melde's Disproportionately and Disparately.**

75.     In mid-March 2018, Chittum suspended Ms. Melde and gave her a "last and final warning" for an outburst that did not warrant such extreme and disparate discipline.

76.     The "outburst" consisted of Ms. Melde hanging up on a phone call with Mr. Chittum in which her frustration reached a level where she needed to cool off and could not continue the conversation.

77.     Ms. Melde did not raise her voice at Chittum.

78.     Ms. Melde apologized for her conduct the next day and acknowledged that she should have behaved more professionally.

79.     Ms. Melde's male colleagues sometimes behaved much more extremely – screaming, cursing, and/or losing their temper with Chittum – but were not disciplined as harshly because of such behavior.

80.     Specifically, Ms. Melde's colleagues Frank Figueroa and Ben Swenson screamed at Chittum with no consequences.

81.     Safeway used the outburst to justify its failure to consider Ms. Melde for a promotion for which she was otherwise qualified and encouraged to apply.

**B.      Safeway Gives Ms. Melde a "Mixed" Performance Review.**

82.     At the end of June 2019, Safeway gave Ms. Melde a "mixed" performance review.

83.     The performance review occurred (1) months after the review period and (2) only after Ms. Melde's complaints about discrimination and retaliation.

84.     Although Ms. Melde never received any training on recoveries, the performance review criticized Ms. Melde for not making enough recoveries.

85.     During the review, Ms. Melde again addressed her training deficiencies, including her need for handcuff certification.

86.     Chittum did nothing to address the training issue.

87.     Instead, the review includes handwritten sexist comments in the "personal goals" section about Ms. Melde's need to be more "independent" and "have more confidence."

88.     Upon information and belief, Chittum authored the handwritten comments.

**C.      Chittum Forces Ms. Melde to Revise a Duplicative Report, Accuses Her of Insubordination, and Launches a Retaliatory Investigation into Ms. Melde's Conduct.**

89.     On July 1, 2018, one of Ms. Melde's male colleagues reported to Chittum that she and Miguel Reyes had done a "bad stop."

90.     In fact, Ms. Melde and Reyes performed a recovery rather than a stop, for which there was no training, standards, or protocol.

91.     The recovery was recounted in Reyes's incident report.

92.     Despite receiving Reyes's report, Chittum required Ms. Melde to submit an additional report about the same incident.

93.     Other male employees were not required to submit duplicative reports.

94.     When Ms. Melde questioned the need to write a duplicate report, Chittum and his supervisor, David Montoya, accused her of insubordination.

95.     Although Ms. Melde ultimately wrote and revised the recovery report, as directed, she – but not her male partner – was reprimanded for "deficiencies" in her report.

96.     Ms. Melde's report was more thorough than those written by her male colleagues including Reyes.

**D.     Ms. Melde Complains About Retaliation for Her Initial Complaint.**

97.     On July 6, 2018, Ms. Melde emailed Judy Dolan and Nathan Bandaries complaining that she was being "singled out and retaliated against" with respect to the recovery report.

98.     Bandaries responded that he and Dolan were unavailable to meet with her because of their vacation schedules and requested that she put her concerns in writing, which she did.

99.     Two days later, Ms. Melde submitted a detailed written complaint listing more than eight (8) ways in which she was being treated differently from her male colleagues,

including the unfair criticism and the requirement to rewrite a recovery report that was already consistent with colleagues' reports and her own prior reports at Safeway.

100.     On or around July 13, 2018, Ms. Melde met with Stacie Phillips from HR and Montoya about her retaliation complaint and explained that Chittum was harassing and berating her, continuing to treat her differently from her male colleagues, denying her necessary training, and critiquing her work for no valid reason.

101.     Montoya responded that he would talk to Chittum about the way he was making her feel, but that she should not have "push[ed] back on the need to write this report" or "asked other APSs if their reports are critiqued."

102.     Ms. Melde additionally complained about gender disparities in raises, store assignments, and the training of new employees.

103.     The HR representative concluded the meeting by acknowledging that Ms. Melde had "a lot of good points."

E.     **Safeway Retaliates Against Ms. Melde Again by Investigating Ms. Melde's, But Not Her Partner's, Conduct During the Recovery.**

104.     The day of Ms. Melde's July 13, 2018, complaint about discrimination and retaliation, Safeway launched an "investigation" of her – but not Reyes's – conduct in the July 1, 2018, recovery.

105.     During the investigation, Ms. Melde reiterated that she had not received any training or guidance regarding recoveries; her training involved only apprehensions.

-14-

106.    In fact, when Ms. Melde asked her trainer about recoveries during the initial training period, he said he doesn't do them.

107.    When Ms. Melde asked Chittum for guidance about a recovery she had done with another colleague, he did not respond to her questions.

108.    When the investigators asked why Ms. Melde hadn't identified herself to the shoplifters, she explained that she was instructed to do so only for apprehensions – and this was not an apprehension.

**F.    Safeway Terminates Ms. Melde Without Giving a Reason.**

109.    Safeway terminated Ms. Melde only ten days after her written complaint to Human Resources regarding retaliation for reporting disparate treatment.

110.    Montoya, who was present at the termination meeting, said only "I think we have enough."

111.    Ms. Melde received no other explanation for her termination.

**FACTUAL ALLEGATIONS REGARDING CARALEIGH KAHN**

**I.    Ms. Kahn Begins Work at Albertsons; She is Not Permitted to Work Alone Unlike Her Male Colleagues.**

112.    Ms. Kahn began working for Albertsons in June 2014 as an APS ORC Investigator in the company's Asset Protection division.

113.    Ms. Kahn was responsible for investigating and thwarting organized shoplifting rings.

114.    Unlike her male colleagues, Ms. Kahn was not permitted to work alone, without a teammate, because of "safety concerns."

115.    The same safety concerns did not apply to the male APS employees who were permitted to work alone.

## II.    Bandaries Sexually Harasses Ms. Kahn By Forcing Ms. Kahn to See Him Late at Night and Forcing Sexual Conversations on Her.

116.    Bandaries often asked Ms. Kahn about her sex life with her husband and talked about his own sexual prowess.

117.    Bandaries did not seem to care that Ms. Kahn was married; to the contrary, he implied that he would be a better lover than her husband.

118.    Bandaries repeatedly called Ms. Kahn at home late at night (after 10:00pm) and instructed her to meet him for "work."

119.    With every late-night call, Bandaries claimed to have a lead requiring immediate attention; each time Ms. Kahn discovered that the lead could have waited until daylight.

120.    Being still new to ORC, Ms. Kahn was afraid to complain about Bandaries' late-night calls for fear of sabotaging her new career path.

121.    In the end, Ms. Kahn's husband complained and told Bandaries to stop calling Ms. Kahn at night.

122.    While Bandaries stopped forcing Ms. Kahn to meet him at night, he continued trying to seduce and sexualize her.

123.    Bandaries never stopped demanding details of Ms. Kahn's sex life, though she never responded to him.

124.    Bandaries told Ms. Kahn that he wanted her to dress up as a prostitute for undercover investigations, saying "we'll put you on the corner of Colfax in something slutty."

125.    That sort of "investigation" was completely unnecessary for ORC work.

126.    Bandaries also regularly pressured Ms. Kahn and other employees to go drinking with him, often during work hours.

127.    Bandaries routinely – at least every Friday, and typically three times per week – chose specific people to go barhopping with him on the clock.

128.    Bandaries always expected and required AP employees to drink with him.

129.    Bandaries encouraged everyone to drink heavily; he wanted men to show that they were not "pussies" (a word he used liberally) and women to be easier targets for seduction.

130.    Bandaries and his confederate Chittum pressured their female coworkers to drink because "you'll be more fun when you're drunk."

131.    Throughout 2016, Bandaries continued to make lewd suggestions to Ms. Kahn, such as sending her a photo of himself and male coworkers pretending to have sex in a bar.

132.    Chittum also harassed Ms. Kahn; upon information and belief, Chittum specifically told Ms. Kahn to "do a shot" with him.

### III.    Bandaries Discriminates Against Ms. Kahn Based on Her Disability

133.    Bandaries also grew increasingly scornful of Ms. Kahn's epilepsy, though he knew about it immediately after hiring her.

134.     Ms. Kahn had one seizure in front of her coworkers (but not Bandaries) in 2015, but those coworkers were generally supportive of her condition.

135.     Bandaries, however, viewed Ms. Kahn's epilepsy as a sign of "weakness."

136.     In June 2016, Ms. Kahn had another seizure while on a work trip with Bandaries.

137.     While Bandaries did the bare minimum necessary to help her, such as calling for medical assistance, he also took pictures of Ms. Kahn while she was unconscious and sent them to her coworkers with mocking captions.

138.     Ms. Kahn was humiliated by this treatment, but Bandaries ignored her protests.

**IV.     Bandaries Blocks Ms. Kahn's Chances for a Promotion.**

139.     In 2016, Ms. Kahn applied for a position as a District Asset Protection Manager (DAPM).

140.     The DAPM position is equivalent to that of Bandaries'.

141.     Bandaries was upset with Ms. Kahn for applying for the promotion, because he felt that she was abandoning him after he had brought her into the company.

142.     Bandaries sabotaged Ms. Kahn 's application by telling John Lites (Director of AP) that she was "not ready" for the increased responsibility, rather than letting the application proceed normally.

143.     Lites relied solely on Bandaries and did not even interview Ms. Kahn.

144.     Following the sabotage of Ms. Kahn's promotion, Bandaries retaliated against Ms. Kahn for applying for a promotion.

-18-

145.    In August 2017, Ms. Kahn was excluded from trips to other states to assist

emergency response teams with flooding after a hurricane.

146.    Ms. Kahn's male colleagues went on those trips instead.

**V.    In Retaliation for Ms. Kahn's Resistance to Bandaries' Harassment, Bandaries
Knowingly Disciplines Ms. Kahn Based on a False Accusation of Theft.**

147.    One of Ms. Kahn's male co-workers falsely accused Ms. Kahn of stealing cash

from a suspect.

148.    The co-worker detained Ms. Kahn based on his claim that she pulled up her pants

"suspiciously" while talking to the suspect.

149.    A "stop" of a suspected shoplifter on such bad evidence would have subjected the

security worker performing the "stop" to discipline, potentially including termination.

150.    Bandaries told Ms. Kahn that he knew she did nothing wrong.

151.    Nevertheless, as a result of the false theft accusation, on November 10, 2017,

Bandaries verbally reprimanded Ms. Kahn and placed her on an "action plan."

152.    The "action plan" required Ms. Kahn to meet with Bandaries weekly and submit a

detailed report listing each task performed that week and the reason for it.

153.    As a result of the "action plan," Ms. Kahn was not permitted to investigate outside

of the office without Bandaries' permission, essentially consigning Ms. Kahn to "desk duty."

154.    Ms. Kahn's male co-worker was not disciplined for a false theft accusation.

155.    As part of the performance plan, Ms. Kahn was not permitted to act on her own

judgment; she had to run every proposed action by Bandaries.

156. After being placed on "desk duty," Ms. Kahn was no longer invited to the social events with her co-workers.

157. After being placed on "desk duty," Ms. Kahn was denied certain job opportunities.

**VI. Ms. Kahn Complains about the Discrimination and is Subjected to Retaliation.**

158. On the day of her reprimand, on November 10, 2017, Ms. Kahn met with the new asset protection director and Labor Relations manager to complain about discrimination.

159. Bandaries was upset to see Ms. Kahn talk to his superiors in his absence and instructed her never to do so again.

160. In January of 2018, Bandaries denied Ms. Kahn an opportunity to get recertified in pressure point control tactics (PPCT).

161. All of Ms. Kahn's male colleagues who were up for recertification were permitted to attend the training and renew their certification.

**VII. Bandaries Uses Ms. Kahn's Disability Accommodation to Manufacture Grounds for Her Termination.**

162. In January of 2018, Ms. Kahn requested to telecommute to accommodate a change in her epilepsy medication.

163. Bandaries approved the request.

164. Bandaries instructed Ms. Kahn to record her telecommuting working hours as 9 am to 5:30 pm with a half hour for lunch, regardless of her actual working hours.

165.    This was Bandaries' standard instruction to all employees to avoid overtime responsibility.

166.    Ms. Kahn obeyed the instruction, even though she frequently worked late into the evening, as late as 2 or 3 am.

167.    Upon her return to the office on February 26, 2018, Ms. Kahn was accused of "time fraud" by District Asset Protection Manager and Human Resources ("the Managers").

168.    The Managers claimed that Ms. Kahn did not work enough hours because she "tokened in" (i.e., signed into the Defendant's internal servers) infrequently.

169.    The majority of Ms. Kahn's work did not require her to "token in."

170.    The Managers also questioned Ms. Kahn about two background searches she had run with Bandaries' permission.

171.    The Managers suspended Ms. Kahn the same day without pay, pending an investigation.

172.    On February 28, 2018, Ms. Kahn submitted a written statement to Human Resources explaining that she was being held to a different standard from her male colleagues.

173.    In her statement, Ms. Kahn named two male co-workers who recorded their work time in the same way as Ms. Kahn but were not disciplined.

174.    On March 2 and 4, 2018, Ms. Kahn submitted additional written statements that she had not violated any company policies and that her actions were approved by Bandaries.

**VIII.   Defendant Terminates Ms. Kahn And Continues Retaliating Against Her Even Post-Termination.**

175.   On March 6, 2018, Defendant terminated Ms. Kahn's employment without giving her a reason.

176.   In May of 2018, Ms. Kahn applied for a job with the Denver Police Department. Upon information and belief, Bandaries called the hiring Detective and told him not to speak with Ms. Kahn.

177.   On June 12, 2018, Ms. Kahn filed an ethics complaint with the Albertsons' EthicsPoint Hotline regarding her discriminatory termination.

178.   On or around July 17, 2018, Ms. Kahn's ex-husband was threatened at work and was told that criminal charges would be filed against Ms. Kahn if she did not drop the complaint.

<u>**FIRST CLAIM FOR RELIEF:**</u>
<u>**SEXUALLY HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII**</u>
<u>**(BY PLAINTIFFS MELDE AND KAHN)**</u>

179.   Plaintiffs reallege and incorporate by reference all allegations in every preceding and subsequent paragraph as if fully set forth herein.

180.   As women, Plaintiffs are members of a group protected from sex discrimination by Title VII.

181.   Ms. Melde was subjected to unwelcome harassment by Chittum, her direct supervisor and an employee of Defendant, as set forth above.

182.   Chittum subjected Ms. Melde to such unwelcome harassment because of her sex.

183.    Chittum's unwelcome harassment of Ms. Melde was sufficiently severe or pervasive to alter a term, condition, or privilege of Plaintiff's employment, and created an abusive working environment.

184.    Ms. Kahn was subjected to unwelcome harassment by Bandaries, her direct supervisor and an employee of the Defendant, as set forth above.

185.    Bandaries subjected Ms. Kahn to such unwelcome harassment because of her sex.

186.    Bandaries' unwelcome harassment of Ms. Kahn was sufficiently severe or pervasive to alter a term, condition, or privilege of Plaintiff's employment, and created an abusive working environment.

187.    The effect of Defendant's practices deprived Plaintiffs of equal employment opportunities and otherwise adversely affected their employment status because of their sex and because of their complaints of discrimination and retaliation.

188.    These unlawful employment practices were intentional.

189.    Defendant engaged in the unlawful employment practices with malice or with reckless indifference to Plaintiffs' protected civil rights.

<u>SECOND CLAIM FOR RELIEF:</u>
<u>GENDER DISCRIMINATION IN VIOLATION OF TITLE VII</u>
<u>(BY PLAINTIFFS MELDE AND KAHN)</u>

190.    Plaintiffs reallege and incorporate by reference all allegations in every preceding and subsequent paragraph as if fully set forth herein.

191.    Ms. Melde was subjected to gender discrimination by Defendant when Chittum, her direct supervisor and a fellow employee of Defendant, treated her differently from her male colleagues including, for example:

a.    Chittum denied Ms. Melde the same job-related training and opportunities for certifications that he afforded her male colleagues;

b.    Chittum denied Ms. Melde the same opportunity for a promotion that he afforded her male colleagues;

c.    Chittum forced Ms. Melde to write and a duplicative report on a recovery – a procedure for which no training or protocol existed, when Ms. Melde's male colleague had already written a report on the same incident.

d.    Chittum forced Ms. Melde to edit the duplicative report, even though the original report had been consistent with the reports submitted by Ms. Melde's male colleagues.

e.    Chittum disproportionately disciplined Ms. Melde for the behavior for which Ms. Melde's male colleagues were not disciplined at all.

192.    Defendant, through its human resources, further discriminated against Ms. Melde by investigating Ms. Melde's, but not her male partner's, conduct during the recovery.

193.    Ms. Kahn was subjected to gender discrimination by Defendant when Bandaries, her direct supervisor and a fellow employee of Defendant:

a.    Sabotaged her promotion;

b.    Retaliated against her for applying for a promotion;

c.    Disciplined her on a trumped-up theft charge;

d.    Used her request for a disability accommodation to set her up for an unjust accusation of time theft.

194.     The effect of Defendant's practices deprived Plaintiffs of equal employment opportunities and otherwise adversely affected their employment status because of their sex and because of their complaints of discrimination and retaliation.

195.     These unlawful employment practices were intentional.

196.     Defendant engaged in the unlawful employment practices with malice or with reckless indifference to Plaintiffs' protected civil rights.

## THIRD CLAIM FOR RELIEF:
## DISABILITY DISCRIMINATION IN VIOLATION OF ADA
## (BY PLAINTIFF KAHN)

197.     Plaintiffs reallege and incorporate by reference all allegations in every preceding and subsequent paragraph as if fully set forth herein.

198.     Ms. Kahn was diagnosed with epilepsy and had occasional seizures.

199.     Ms. Kahn is a "qualified individual" under the ADA, because she can perform the essential functions of her job with or without accommodation. 42 U.S.C. § 12111.

200.     Ms. Kahn was subjected to disability discrimination by Defendant when Bandaries, her direct supervisor and a fellow employee of Defendant:

a.     Photographed Ms. Khan during her seizure;

b.     Distributed her photograph to her fellow employees;

c.     Subjected her to ridicule for having epilepsy;

d.     Called her disability a "weakness";

e.     Laughed off her protests and complaints regarding being ridiculed.

201.    Defendant's treatment of Ms. Kahn was discriminatory in violation of ADA, 42 U.S.C. § 12112(a).

202.    The effect of Defendant's practices deprived Plaintiff of equal employment opportunities and otherwise adversely affected her employment status because of her disability and because of her complaints of disability discrimination.

203.    These unlawful employment practices were intentional.

204.    Defendant engaged in the unlawful employment practices with malice or with reckless indifference to Plaintiff Kahn's protected civil rights.

**FOURTH CLAIM FOR RELIEF:**
**RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY UNDER TITLE VII**
**(BY PLAINITFF MELDE AND KAHN)**

205.    Plaintiffs reallege and incorporate by reference all allegations in every preceding and subsequent paragraph as if fully set forth herein.

206.    Plaintiffs engaged in protected activity under Title VII by verbally and in writing complaining about the gender-based harassment, unequal pay, unequal discipline, lack of training, and failure to promote. In doing so, Plaintiffs opposed a hostile work environment and discrimination on the basis of their sex, a practice made unlawful by Title VII.

207.    Plaintiffs engaged in protected activity under Title VII by verbally and in writing stating that they were being retaliated against for complaining about gender-based unequal treatment. In doing so, Plaintiffs opposed retaliation for good-faith complaints of gender-based hostile work environment and other discrimination, a practice made unlawful by Title VII.

208.    Defendant knew that Plaintiffs had engaged in protected activity under Title VII by complaining that they were being subjected to sex discrimination and unlawful retaliation.

209.    Beginning almost immediately after Plaintiff Melde complained of sex discrimination, Defendants began retaliating against Ms. Melde, by forcing her to write and edit a duplicative report, giving her a mixed review, and disproportionate discipline. Those actions were directly causally related to Plaintiff Melde's complaint of sex discrimination.

210.    After Plaintiff Melde complained of retaliation, Defendant continued to retaliate against Plaintiff by terminating Plaintiff's employment. Plaintiff's discipline and termination by Defendants were directly causally related to her engagement in protected activities.

211.    Shortly after Plaintiff Kahn complained of sex discrimination, Defendant terminated her, prevented her from getting another job, and threatened her with criminal prosecution if she fails to withdraw her legitimate and good-faith ethics complaint. Those actions were directly causally related to Plaintiff Kahn's complaint of sex discrimination.

212.    A reasonable employee would find disproportionate discipline, unequal treatment, denial of promotion, and termination of employment to be materially adverse employment actions.

213.    The effect of Defendant's practices deprived Plaintiffs of equal employment opportunities and otherwise adversely affected their employment status because of their sex and because of their complaints of discrimination and retaliation.

214.    These unlawful employment practices were intentional.

215.     Defendants engaged in the unlawful employment practices with malice or with reckless indifference to Plaintiffs' protected civil rights.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request:

1.     That this Court assume jurisdiction;

2.     That this Court enter judgment in Plaintiffs' favor and against Defendant;

3.     That this Court declare the actions of Defendant described in this Complaint to be in violation of Title VII, as amended, and the common law of the State of Colorado;

4.     That this Court award Plaintiffs all appropriate relief at law and equity, including but not limited to back pay with pre-judgment interest, front pay, a gross-up adjustment for taxes and any subrogation interests and all other make whole relief, including all available consequential/compensatory damages;

5.     That this Court grant compensatory and consequential damages against Defendant, including but not limited to damages for emotional distress, humiliation, loss of income and enjoyment of life, and other pain and suffering on all claims by law in the amount to be determined at trial against the Defendant, as allowed by law;

6.     That this Court grant exemplary and/or punitive damages as allowed by law;

7.     That this Court award attorneys' fees and costs of this action, including expert witness fees, on all claims allowed by law;

8.     That this Court award pre-judgment and post-judgment interest at the highest lawful rate; and

9.      That this Court award such additional or alternative relief as may be just, proper and equitable.

PLAINTIFFS REQUEST A JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted this 26th day of July 2021 by:

KING & GREISEN, LLP

/s/ *Diane S. King*
Diane S. King
KING & GREISEN, LLP
1670 York Street
Denver, CO 80206
(303) 298-9878 (voice)
(303) 298-9879 (fax)
king@kinggreisen.com

*Attorney for Plaintiffs*

Plaintiffs' Addresses:

Jamie Melde
1020 Dark Horse Drive West
Colorado Springs, CO 80919

Caraleigh Kahn
4955 Shelby Drive
Castle Rock, CO 80104